United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E. BERTITA TRABERT GRAEBNER, individually and as Trustee of the El Nora L. Trabert Irrevocable Trust, TALLIE R. TRABERT, individually and as Trustee of the El Nora L. Trabert Irrevocable Trust, T. VERNON TRABERT, individually and as Trustee of the El Nora L. Trabert Irrevocable Trust,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL E. JAMES, an individual, MNM PROPERTIES, LLC, a foreign limited liability company, WM. PAGE & ASSOCIATES, INC., a foreign corporation, WILLIAM SCOTT PAGE, an individual, and DOES 1–50, inclusive,<br><br>Defendants. | No. C 12-01694 WHA<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

### INTRODUCTION

In this action involving alleged fraud in the sale of "viatical life settlement contracts," a number of defendants move for summary judgment. As set forth below, because the undisputed facts establish that plaintiffs were on notice of the alleged fraud over three years before the filing of this action, defendants' motion for summary judgment is **GRANTED**.

### STATEMENT

Defendants William Scott Page and Wm. Page & Associates, Inc. move for summary judgment as to plaintiffs' claims against them. The motion does not seek summary judgment as

1  to defendants Michael E. James and MNM Properties, LLC. Plaintiffs are the adult children and
2  co-trustees of a family trust. In 2002, plaintiffs' lawyer, defendant Michael James, convinced
3  plaintiffs to purchase benefits under three life insurance policies. Attorney James "was the long-
4  time estate-planning attorney and advisor to plaintiffs and their parents" (First Amd. Compl. ¶
5  24). On behalf of plaintiffs and their parents, Attorney James set up the El Nora Trabert
6  Irrevocable Trust No. 2 and a limited partnership called Trabert Partners, L.P. In 2002, acting in
7  their capacity as trustees of the El Nora Trust or as advisors to Trabert Partners, plaintiffs
8  purchased three so-called "viatical life settlement contracts." A viatical contract is an agreement
9  whereby an individual (the viator) sells his or her life insurance policy to a third party at a
10 discount in exchange for immediate cash. "The third party investor becomes the beneficiary of
11 the policy[] and is thereby entitled to a death benefit equal to the face value of the policy upon
12 the viator's demise, if the policy is valid and kept in force" (*id*. at ¶ 28).

13 On behalf of plaintiffs, Attorney James made arrangements with defendant Wm. Page &
14 Associates, doing business as The Lifeline. Plaintiffs purchased three viatical contracts from
15 Lifeline in 2002. Plaintiffs allege that Lifeline and Attorney James made numerous
16 misrepresentations, upon which plaintiffs relied in deciding to purchase the viatical contracts.
17 The gravamen of the allegations are that defendants misrepresented the risks of the viatical
18 contracts, provided inaccurate life expectancy estimates, and failed to disclose that plaintiffs
19 might be required to pay expensive premiums to keep the contracts current. Plaintiffs also allege
20 that Attorney James was an agent and representative of Lifeline and that James received a
21 commission for the transactions. While plaintiffs acknowledge that they were aware that
22 Attorney James would receive a commission on the contracts, they state that they were not aware
23 of the amount of the commission, which was seven percent of the amount plaintiffs invested in
24 Lifeline policies (Steuer Decl. Exh. 15).

25 To put it more bluntly, this was (and remains) an industry seeking to profit from the
26 misfortune of AIDS by allowing AIDS victims to obtain badly needed cash by selling (at a
27 discount) their benefits under life insurance policies to "investors" expecting the victims to die
28 on time, all arranged via brokers like defendants here. The problem here arose when the AIDS

2

1 victims managed to live longer than expected (due to breakthroughs in medicine), leading to the
2 need for the investors to continue premium payments longer than expected and in turn leading
3 them to claim they were misled.

### 1. PLAINTIFFS PURCHASED THREE VIATICAL CONTRACTS IN 2002.

In May 2002, Attorney James entered into a "representative agreement" with Viati Com (Steuer Decl. Exh. 15). The agreement states that Viati Com "is a company acting as a Marketing Manager for Page & Associates, Inc. (d.b.a.) The Lifeline Program." Pursuant to the agreement, James agreed to serve as a representative of Viati Com to "locate purchasers who are interested in purchasing Policies of Lifeline Clients," for which he would receive a commission of 7% from Viati Com. According to the agreement, "Viati Com entered into this Agreement solely as principal and not as agent for Lifeline" (*id.* at ¶ 4.2). Attorney James worked with Viati Com and Charles Mattox, an insurance broker from Viati Com, to select appropriate viatical contracts for plaintiffs to invest in (James Decl. ¶ 24). At times, Mattox sent contracts directly to plaintiffs to consider (Defendants' Dep. Exh. 36).

On May 15, 2002, plaintiffs (through Trabert Partners) invested approximately $282,000 into purchasing benefits under a life insurance policy issued through Aetna. The viator for the Aetna viatical contract had been diagnosed with AIDS (*id.,* Exh. 12). According to American Viatical Services's life expectancy report, the Aetna viator had a projected life expectancy of 72 months (*ibid*.). Thus, plaintiffs expected the policy to pay out in March 2008 (First Amd. Compl. ¶ 62; Steuer Decl. Exh. 12).

On August 21, 2002, plaintiffs (through the Trust) invested approximately $78,000 into purchasing benefits under a policy issued through Union Bankers Insurance Company. The viator for the Union Bankers viatical contract had also been diagnosed with AIDS; AVS's life expectancy report stated that the viator had a projected life expectancy of 24 months (*id*., Exh 28). Plaintiffs expected the policy to pay out in August 2004 (First Amd. Compl. ¶ 57; Steuer Decl. Exhs. 26 and 28). Lastly, plaintiffs (through the Trust) invested approximately $115,700 into purchasing benefits under a policy issued by Principal Financial.

### 2. PLAINTIFFS DID NOT RECEIVE PAYMENTS FOR TWO OF THE VIATICAL CONTRACTS.

In 2005, plaintiffs received death benefits from the Principal Financial policy when the viator passed away.[1] Plaintiffs received a profit of approximately $35,000 (James Decl. ¶ 31). Plaintiffs did not, however, receive death benefits from the other two contracts inasmuch as the viators have lived longer than expected due to great improvements in AIDS medication. The viators' projected demise dates — and plaintiffs' expected payoff dates — for the Union Bankers and Aetna contracts were in 2004 and 2008, respectively. In order to keep the underlying insurance policy in force, plaintiffs were required to start paying premiums in 2006 on the Union Bankers viatical contract (Defendants' Dep. Exhs. 68 and 69). Plaintiffs contend that the amount of premium payments they would be required to pay was never disclosed to them prior to purchase (Page Dep. 46; T. Trabert Decl. ¶ 23). As to the Aetna viatical contract, the viator's projected demise date was in March 2008, but because the viator had not expired by that time, plaintiffs did not (and still have not) received any payment on the contract.

### 3. PLAINTIFFS EXPRESSED CONCERNS TO ATTORNEY JAMES.

In early 2008, plaintiff Tallie Trabert contacted Attorney James with concerns about the viatical contracts. Ms. Trabert sent Attorney James an email and letter in January and February 2008 expressing concerns with Lifeline's disclosures regarding the status of the viatical contracts. Ms. Trabert stated that they should contact the Attorney General of the State of Florida, where Lifeline was located, regarding any ongoing litigation against Lifeline (Steuer Decl. Exh. 33; Defendants' Dep. Exh. 155). Attorney James conducted some investigation on behalf on plaintiffs in 2008 but advised against filing any lawsuit. In November 2009, Attorney James notified plaintiffs that he was retiring and would no longer represent them as their attorney (Graebert Decl. ¶ 7).

On January 27, 2011, Ms. Trabert received a notice stating that Wm. Page & Associates would begin servicing the United Bankers viatical contract (Steuer Decl. Exh. 36). Ms. Trabert testified that this notice caused her concern because "it didn't seem right" (T. Trabert Dep. at

---

[1] The parties have provided no information regarding the viator's diagnosis or whether the viator survived past the projected demise date.

4

159). Accordingly, she informed her siblings, Mr. Trabert and Ms. Graebner. Ms. Graebner shared her concerns. As Attorney James was no longer available, they consulted with other counsel. Plaintiffs then filed this action in state court on February 1, 2012, alleging the following claims against all defendants: (1) breach of fiduciary duty, (2) intentional misrepresentation, (3) negligent misrepresentation, (4) false promise and (5) fraud by omission. Defendants removed the action to federal court in April 2012. A motion to dismiss was granted herein as to the claim for false promise against all defendants and the claim for breach of fiduciary duty was dismissed as against defendants Page and Wm. Page & Associates ("Lifeline"). Defendants Page and Wm. Page & Associates now move for summary judgment on the grounds that the statute of limitations has run on plaintiffs' claims, Attorney James was not defendants' agent, plaintiffs cannot prove the required elements of their claims, and that Wm. Page & Associates is not an alter ego of Page. As this order finds that there is no triable issue of material fact as to the statute of limitations defense, the motion for summary judgment is **GRANTED**.

## ANALYSIS

### 1. SUMMARY JUDGMENT STANDARD.

Summary judgment is proper when the pleadings and the evidence in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(a). Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show there exists a genuine issue of material fact. An issue is genuine only if there is sufficient evidence for a

5

reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–49 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Ibid.* Conclusory, speculative testimony in affidavits and moving papers, however, is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## 2. STATUTE OF LIMITATIONS.

This Court previously held herein that the statute of limitations applicable to plaintiffs' claims against Lifeline is three years for claims of fraud or intentional misrepresentation and two years for negligent misrepresentation (Dkt. No. 54) (citing *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Assocs., Inc.*, 115 Cal. App. 4th 1145, 1155 (2004)). That order declined to grant defendants' motion to dismiss based on a statute of limitations defense as the record was not sufficiently developed at that time. Defendants have now filed a motion for summary judgment contending that the undisputed evidence proves that plaintiffs were on actual or constructive notice of the alleged fraud in 2006 or 2008, such that the limitations period had run by the time plaintiffs filed their complaint on February 1, 2012. This order pauses to note that the various agreements between the parties include a choice-of-law provision selecting Florida law (*see, e.g.,* Defendants' Dep. Exh. 14 at 3). As both parties' briefs on the motion for summary judgment rely on California law and do not contend that Florida law should apply here, the parties are deemed to have waived any such argument. Accordingly, this order proceeds to consider the statute of limitations issue based on California law.

"The uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim." *Fox v. Ethicon Endo-Surgery, Inc*., 35 Cal. 4th 797, 807 (2005) (quoting *Gutierrez v. Mofid*, 39 Cal. 3d 892, 897 (1985)) (emphasis in original). The limitations

6

period begins once the plaintiff "has notice or information of circumstances to put a reasonable person on inquiry . . . ." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110–11 (1988) (internal quotations and citations omitted). "[P]laintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." *Fox*, 35 Cal. 4th at 808. Plaintiffs have the burden of establishing facts showing that they were not negligent in failing to make the discovery sooner and that they had no actual or presumptive knowledge of facts sufficient to put them on inquiry. *April Enterprises, Inc. v. KTTV*, 147 Cal. App. 3d 805, 833 (1983) (quoting *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 437 (1945)). A district court may grant summary judgment "only if uncontroverted evidence 'irrefutably demonstrates that a plaintiff discovered or should have discovered [the cause of action] but failed to file a timely complaint.'" *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (*quoting Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987)).

### A. Plaintiffs expressed suspicions in early 2008 and 2009.

Defendants argue that plaintiffs were on inquiry notice of the alleged fraud and misrepresentations in January 2006, when they were required to pay premiums on the Union Banker viatical contract. By that time, defendants contend, plaintiffs were aware that the AVS report regarding the viator's life expectancy was inaccurate. Plaintiffs were also aware of the amount of premiums they would be required to pay if the viator survived beyond his projected demise date, which the complaint alleges is among defendants' fraudulent misrepresentations and omissions.

Defendants further argue that by 2008 and continuing throughout early 2009, plaintiffs had actual knowledge of the facts underlying their claims. Beginning in January 2008, plaintiff Tallie Trabert sent Attorney James emails and letters raising concerns about the viatical contracts and the adequacy of the information provided by defendants. On January 27, 2008, Ms. Trabert wrote an email to Attorney James in which she raised questions about how the trustees could obtain a regular report on the status of the viatical contracts and expressed concerns that they were receiving insufficient information. She stated (Defendants' Dep. Exh. 155):

7

> How are they currently marketing viatical's [sic] without violating HIPPA laws. We have a right to know the status of our investment. Do we need to file a formal compliant [sic] with the Attorney General of Florida?

On February 11, 2008, Ms. Trabert wrote a letter to Attorney James raising a number of concerns regarding the viatical contracts, whether Lifeline was a legitimate company, and whether plaintiffs' investment in the contracts was a "scam" (Steuer Decl. Exh. 33). Ms. Trabert's letter raised, inter alia, the following concerns (*ibid.*):

- We are having out of pocket expense [sic], payment of the insurance premium, to maintain our investment, insurance policy. Like a scam that requires up front monies to apply for a benefit.

- With out of pocket expenses, the return on investment, [sic] is plummeting.

- How are the current HIPPA laws governing the information divulged to new prospective purchasers?

- As far as we know, Lifeline is using our funds for their own benefit at our expense. Who are they responsible to? Who do they report to? Where is the accountability? Who owns Lifeline?

- If we are investors by being policy holders, where are the Annual Corporate Reports for the Company(s) involved? Where are the reports on how many claims were settled last year?

- I believe it is time to network. To find others, who are in a similar situation and inquire as to how they are dealing with the issues.

- I believe it is time to contact the Attorney General of the State of Florida. It is time to inquire as to what law suits, civil or criminal, if any, are pending at this time.

After listing these concerns, the letter concludes: "We would appreciate your resolving these pending, growing bitter, issues around these insurance policies/investments" (*ibid.*). On or around January 28, 2009, Ms. Trabert wrote a note to Attorney James stating that this was the third year they had to pay Lifeline a premium to keep the Union Bankers insurance policy. The note stated that "this has to be fraudulent in some manner! What have you found out. Is this another Bernie Madoff?" (Defendants' Dep. Exh. 150).

After receiving Ms. Trabert's January 2008 email and February 2008 letter, Attorney James discussed with plaintiffs their dissatisfaction with the viatical contracts and Lifeline "from time-to-time" (James Decl. ¶ 39). In October 2008, Attorney James sent an email to all

8

1    three plaintiffs noting Lifeline's website and stating that he would follow up on the matters they

2    discussed (Defendants' Dep. Exhs. 134 and 135). According to James, the emails were in

3    connection with plaintiffs' request that he "do some investigation into The Lifeline" (James

4    Decl. ¶ 39). The email further stated: "I thought you might like to see that at least they are still

5    in business" (Defendants' Dep. Exh. 134). Ms. Graebner responded that Attorney James should

6    "please follow through — as it is very relevant for all of us" (*ibid*).

7        In March 2008, the viator for the Aetna contract was projected to die. According to the

8    complaint, however, "the last statement that plaintiffs received for this contract is dated July 24,

9    2008, and states that the viator is alive" (First Amd. Compl. ¶ 62). Plaintiffs allege they

10   received no statements or communications regarding the Aetna contract since that date. Nor

11   were plaintiffs provided any information regarding the viator's health status, whether s/he was

12   still alive, or whether the underlying insurance policy was still in force (*ibid*.). It is undisputed

13   that the viator outlived his or her projected demise date and that plaintiffs have not received any

14   payment from the Aetna policy.

15       Lifeline argues that the foregoing facts demonstrate that plaintiffs had either actual or

16   inquiry knowledge of the facts underlying their fraud claim in 2008.

17       **B.    Plaintiffs contend the statute of limitations did not run until 2011.**

18       Plaintiffs argue that (1) while Ms. Trabert had concerns about the contracts in early

19   2008 and 2009, she did not have knowledge of any "facts" that would put her on notice of

20   fraud, (2) the individual plaintiffs were not engaged in an "intensive ongoing investigation" and

21   were busy with other personal matters, and (3) the statute of limitations was tolled by Attorney

22   James' reassurances. Plaintiffs state that they were not motivated to investigate any potential

23   claims until they received a letter from Wm. Page & Associates in January 27, 2011, informing

24   them that it would begin servicing the Union Bankers viatical contract. Plaintiffs' declarations

25   state that they were "very concerned" about the fact that Wm. Page & Associates would be the

26   contract servicer (T. Trabert Decl. ¶ 10; E. Graebner Decl. ¶ 8; V. Trabert Decl. ¶ 8). As

27   Attorney James had retired in late 2009, they consulted with new counsel in 2011 and

28   subsequently filed this action in February 2012.

9

### *i. Plaintiffs were on inquiry notice in 2008.*

Plaintiffs' first two arguments are unavailing. As stated by the California Supreme Court in *Jolly*, 44 Cal. 3d at 1111:

> A plaintiff need not be aware of the specific "facts" necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her.

As to Ms. Trabert, it is clear that in early 2008, she had very specific concerns regarding whether Lifeline was a legitimate business or was operating a fraudulent "scam." She was also concerned about the disclosures and information Lifeline was providing regarding the viators and the underlying insurance policies (Steuer Decl. Exh. 33). Similarly, Ms. Graebner voiced concerns to Attorney James in 2008 regarding whether Lifeline was a viable business and asked him to undertake an investigation of the company. Mr. Trabert was aware of these concerns (V. Trabert Dep. 51–52).

The California Supreme Court has held that a plaintiff's suspicions of fraud put her on inquiry notice of potential wrongdoing. *Miller v. Bechtel Corp.*, 33 Cal. 3d 868, 875 (1983). In *Miller*, the plaintiff filed suit soon after discovering facts that confirmed her suspicion that her former husband had concealed the actual worth of his assets during dissolution proceedings. The California Supreme Court noted that the plaintiff had doubts as to the actual value of her husband's stock at the time she signed the dissolution agreement, but neither she nor her attorneys took adequate steps to investigate the matter. When the stock was sold years later for a much higher price than that stated during the dissolution discussions, plaintiff filed suit. *Miller* held that the plaintiff's early suspicion put her on inquiry notice of the potential wrongdoing, which an investigation would have confirmed based on publicly available information. Her attorneys conducted some investigation on her behalf, writing defendant's attorney requesting information on two separate occasions. "Since plaintiff's representatives chose not to pursue their inquiry further despite their suspicions, she is charged with knowledge

1  of facts which would have been revealed if she had pursued the investigation." *Ibid.* As she
2  failed to timely investigate, her action was barred by the statute of limitations.

3  So too here. Plaintiffs expressed specific suspicions and concerns regarding the viatical
4  contracts and Lifeline as a company. They requested that Attorney James investigate their
5  concerns. Had plaintiffs conducted a reasonable investigation, publicly available information
6  would have been available that indicated that, as of 1998, it was known in the viatical contracts
7  industry that "about one third of AIDS patients do very well on the '3-drug cocktail'" and that
8  buyers should not "fall for a sales pitch based on the mortality of AIDS patients" (Steuer Decl.
9  Exh. 16).[2] This order finds that plaintiffs' suspicions put them on inquiry notice of the
10 potential wrongdoing in 2008. That they failed to adequately investigate the matter at the time
11 does not stop the clock from running on their claims.

12 Even if Ms. Trabert's suspicions were not shared equally by her two siblings, the
13 standard for the discovery rule is whether the plaintiff "has notice or information of
14 circumstances to put a *reasonable person* on inquiry . . . ." *Jolly*, 44 Cal. 3d at 1110–11
15 (emphasis added). Defendants have identified a number of red flags that would have been
16 sufficient to put a reasonable investor on notice of potential wrongdoing. Plaintiffs purchased
17 two viatical contracts where the viators of the underlying insurance policies were diagnosed
18 with AIDS. By mid-2008, plaintiffs were aware that both life expectancy projections had not
19 been accurate. In fact, the Union Bankers viatical contract was over three-and-a-half years
20 overdue by March 2008, the date the Aetna contract failed to pay out. Not only did the viatical
21 contracts fail to pay out when projected, but plaintiffs were aware by 2006 that they would be
22 required to pay premiums to keep the Union Bankers policy current in an amount that could
23 allegedly overwhelm their expected return. Moreover, plaintiffs were aware of and expressed
24 concerns regarding Lifeline's failure to make sufficient disclosures regarding the status of the
25 viators and plaintiffs' financial investments.

---

[2] Exhibit 16 is an excerpt from Viatical Settlements: An Investor's Guide by Gloria Grening Wolk, published in 1998 by Bialkin Books, at pages 29–30.

11

Defendants argue that this action is analogous to the facts in *In re Infonet Services Corporation Securities Litigation*, 310 F. Supp. 2d 1106, 1119 (C.D. Cal. 2003) (Judge Nora Manella), where the district court dismissed a securities fraud claim because plaintiffs were on notice of the fraud prior to the one-year limitations period. The decision in that case stated that "dramatic discrepancies between the very precise projections made by defendants and the actual results, . . . [can be] sufficient to give . . . inquiry notice which start[s] the limitations clock. . . . This is not to say that the discrepancies prov[e] fraud, but simply that a reasonable investor would have believed that fraud was a possible explanation." *Ibid.* (*quoting Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 (7th Cir.1995)). In *Infonet*, the court held that the investors had actual knowledge of fraud where the defendant company's projections regarding the success of the relevant transaction had failed to timely materialize as promised. "[A]n exercise in simple math would have alerted any investor that the Prospectus's prediction of a 12 to 18-month transition period . . . was demonstrably untrue." *In re Infonet*, 310 F. Supp. 2d at 1119. The court found that if the analysts' reports available in the months prior were not sufficiently clear, by the end of the 18-month period "no reasonable investor" could claim ignorance of the fact that the company's projections regarding the transaction were incorrect. Similarly, plaintiffs allege herein that they relied on the life estimates to be accurate; the gravaman of the complaint is that the viators did not expire as projected by the life estimates such that plaintiffs have not received benefits and have been required to pay premiums. The fact that the Union Bankers and Aetna contracts both failed to meet the projected dates and produce the expected benefits by 2008, in combination with plaintiffs' actual concerns regarding the Lifeline company, would have caused any reasonable investor to suspect fraud.

As this order finds that plaintiffs were on inquiry notice of the alleged fraud and/or misrepresentations by 2008, plaintiffs' claims are barred unless they can establish that the statute of limitations was tolled. This order now turns to plaintiffs' claim that the statute of limitations was tolled by Attorney James' assurances.

          ***ii.    No triable issue of fact regarding plaintiffs' claim that the statute of limitations was tolled.***

Plaintiffs contend that Attorney James' assurances in response to plaintiffs' concerns in 2008 and 2009 tolled the statute of limitations as to all defendants. Under California law, the statute of limitations may be tolled by reassurances made to a plaintiff by someone in a fiduciary relationship, such as a broker or an attorney. *See Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 460 (9th Cir. 1986) (citing *Twomey v. Mitchum, Jones & Templeton, Inc.*, 262 Cal. App. 2d 690, 728 (1968)). For example, in *Alton v. Rogers*, 127 Cal. App. 2d 667, 680 (1954), the California Court of Appeal held that the plaintiff was entitled to rely on the many reassurances of the defendant, her then-attorney, which "legitimately delayed the discovery of the fraud." The plaintiff's claim against the attorney-defendant was therefore not time-barred. Similarly, our court of appeals has applied California law in a lawsuit by a former client against a broker and the broker's employer, stating that "[i]f the plaintiff proves that she relied on [the broker's] promise to monitor her account and his advice not to worry," her claim would not be barred by the statute of limitations. *Vucinich*, 803 F.2d at 460. Here, plaintiffs claim that Attorney James was in a fiduciary relationship to them and that they reasonably relied on his assurances that he did not believe there was any basis for a lawsuit against Lifeline "other than the fact that the people lived longer than we thought they would" (James Dep. 293).

Plaintiffs have not, however, argued that Lifeline made any assurances to them, and this Court has previously held that Lifeline was not in a fiduciary relationship with plaintiffs. To the contrary, plaintiffs have alleged that Lifeline failed to update them regarding the status of the viatical contracts and did not provide any information to them when requested. Plaintiffs have cited no authority for the proposition that one defendant's assurances or fraudulent concealment can serve to toll the statute of limitations as to claims against third parties. Nor has this Court's own research identified any such authority, binding or otherwise.

Although plaintiffs' opposition does not explicitly brief this position, plaintiffs' attorney argued at the motion hearing that Attorney James was the acting as the sub-agent or representative of Lifeline in 2008 and 2009 when he conducted investigations into Lifeline on

13

behalf of plaintiffs. As a general matter, "the fraud of the agents will be imputed to the principal for the purpose of preventing the running of the statute of limitations, whether the principal was aware of it or not. . . . The principal, having received the benefit of his agents' fraud, has no equity in his favor." *Lightner Mining Co. v. Lane*, 161 Cal. 689, 703 (1911). "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Van't Rood v. Cnty. of Santa Clara*, 113 Cal. App. 4th 549, 571 (2003). Here, plaintiffs have adduced no admissible evidence establishing that Attorney James was acting as Lifeline's agent in 2008 and 2009, the time period relevant to plaintiffs' contention that the statute of limitations was tolled by James' repeated assurances to them.

Plaintiffs contend that Attorney James was an agent of Lifeline when they initially bought the viatical contracts in 2002. As discussed above, Attorney James signed a "representative agreement" with Viati Com in May 2002 (Steuer Exh. 15). The agreement states that Viati Com "is a company acting as a Marketing Manager for Page & Associates, Inc. (d.b.a.) The Lifeline Program." Pursuant to the agreement, James agreed to serve as a representative of Viati Com to "locate purchasers who are interested in purchasing Policies of Lifeline Clients," for which he would receive a commission of 7% from Viati Com (*id.* at ¶ 3.1). Plaintiffs were aware that James would receive a commission when they purchased the viatical contracts at issue, but state that they were not aware of the specific amount of the commission. According to the agreement, "Viati Com entered into this Agreement solely as principal and not as agent for Lifeline" (*id.* at ¶ 4.2). The agreement also stated that "the intention of this Agreement is that each party shall remain an independent contractor solely responsible for its own actions . . . No employee or agent of one party shall be considered as an employee or agent of the other" (*id*. ¶ 7.1). The parties dispute the significance of this document. Lifeline contends that the agreement "clearly stated that [James] was not being hired by Lifeline and it provided no authority to act on its behalf," citing to California Civil Code Section 2350 and 2022 (Reply 15). Moreover, the record is devoid of any evidence that Attorney James, Lifeline, or plaintiffs believed that James was acting as the agent of Lifeline in the 2002 transactions.

14

Even if there is a triable issue of fact regarding whether Attorney James was acting as the agent of Lifeline in 2002, an issue which this order does not reach, plaintiffs point to no evidence establishing that James was acting as an agent of Lifeline in 2008 and 2009. In fact, plaintiffs ignore the issue entirely, both in their briefing and in the voluminous record submitted in opposition to defendants' motion. The undisputed facts show that Attorney James received a commission of $36,680 in May 2002 from Viati Com (Defendants' Dep. Exh. 153). Plaintiffs have not identified any further payments or communications between Viati Com and James after 2002. Attorney James states that he received no commissions or fees from Lifeline (James Decl. ¶ 32). Nor is there any evidence of a written or oral agreement between James and Lifeline from which a reasonable fact-finder could infer an agency relationship, particularly in 2008 — six years after plaintiffs purchased the viatical contracts.

Lastly, on these facts, plaintiffs cannot demonstrate as a matter of law that Lifeline ratified James' actions in 2008 and 2009. "A principal may ratify an agency 'by accepting or retaining the benefit of the act, with notice thereof.' But 'ratification is possible only when the person whose unauthorized act is to be accepted purported to act as agent for the ratifying party.'" *Van't Rood v. Cnty. of Santa Clara*, 113 Cal. App. 4th 549, 571 (2003) (internal citations omitted). Until he announced his retirement to plaintiffs in 2009, Attorney James continued to provide legal services to plaintiffs as their attorney in various matters related to estate planning and trust work (James Decl. ¶¶ 3, 4; T. Trabert Decl. ¶ 9). When plaintiffs expressed suspicions to James in early 2008 through 2009, James undertook an investigation on their behalf into the status of the viatical contracts and Lifeline's viability as a company. Whether James' investigation or his legal analysis regarding any potential lawsuit was deficient is an issue for plaintiffs to prove at trial against James and MNM Properties, LLC. Absent any evidence that Lifeline authorized Attorney James to act as an agent on its behalf, or that James led plaintiffs to believe that his repeated assurances were made on behalf of Lifeline, plaintiffs' claims that the statute of limitations was tolled as against Lifeline fail.

Accordingly, because the undisputed facts establish that plaintiffs were on inquiry notice of the alleged fraud prior to February 1, 2009, and plaintiffs have failed to establish that the

limitations period was tolled as to Lifeline, defendant Page and Wm. Page & Associates' motion for summary judgment is **GRANTED**.

In connection with the briefing on defendants' motion, the parties filed a number of evidentiary objections. To the extent that the evidentiary objections are not mooted by this order, they are overruled. Plaintiffs also filed a motion to strike the late-filed declaration of Miriam Karl (Dkt. No. 74). Karl's declaration relates to the issue of whether plaintiffs are the beneficiaries of the Aetna insurance policy, such that they will actually receive the death benefits when the viator eventually passes. Plaintiffs contend that there was a problem with the paperwork and the benefits were not properly assigned to them. This allegation was not included in the complaint; defendants argue that this claim was brought up for the first time in plaintiffs' opposition to the motion for summary judgment. Plaintiffs' counsel argued at the hearing that the information regarding the defective assignment was first brought to plaintiffs' attention through discovery received pursuant to this action. This order does not consider this claim regarding improper assignment, as it is outside the pleadings and no motion to amend the complaint was ever filed. At this stage in the proceedings, it is too little too late. As this order does not rely upon the Karl declaration, the motion to strike is **DENIED AS MOOT**.

## CONCLUSION

For the reasons stated above, defendants Page and Wm. Page & Associates' motion for summary judgment is **GRANTED**. As set forth in the order to show cause, filed concurrently herewith, plaintiffs are ordered to show cause why the remaining defendants should not be dismissed. Plaintiffs' response is due by **AUGUST 1**. The final pre-trial conference in this action, currently set for August 7, 2013, is hereby reset for **AUGUST 5 AT 2:00 P.M.**

**IT IS SO ORDERED.**

Dated: July 25, 2013.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE